PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-1580
_____

BARRY J. BELMONT;
PHILADELPHIA FINANCIAL SERVICES, LLC;
THOMAS J. KELLY, JR.;
FRANCES R. KELLY;
GARY O. PEREZ,

Appellants,

v.

MB INVESTMENT PARTNERS, INC.;
CENTRE MB HOLDINGS;
CENTRE PARTNERS MANAGEMENT, LLC;
ROBERT M. MACHINIST; MARK E. BLOOM;
RONALD L. ALTMAN; LESTER POLLACK;
WILLIAM M. TOMAI; GUILLAUME BEBEAR;
P. BENJAMIN GROSSCUP; THOMAS N. BARR;
CHRISTINE MUNN; ROBERT A. BERNHARD
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 09-cv-4951)
District Judge: Hon. Berle M. Schiller
_____

Argued
November 13, 2012

Before:   SCIRICA, FISHER, and JORDAN, *Circuit Judges*.

(Filed : February 22, 2013)
_____

Joseph R. Loverdi
Paul C. Madden   [ARGUED]
Buchanan Ingersoll & Rooney
50 South 16th Street , Suite 3200
Philadelphia, PA   19102
     *Counsel for Appellants*


Peter J. Hoffman
Jeffrey P. Lewis
Eckert, Seamans, Cherin & Mellott
50 South 16th Street – 22nd Floor
Philadelphia, PA   19102

Edward D. Kutchin   [ARGUED]
Kerry R. Northup
Berluti McLaughlin & Kutchin
44 School Street – 9th Floor
Boston, MA   02108
    *Counsel for Appellees, MB Investment Partners Inc.,*
    *Robert M. Machinist,P. Benjamin Grosscup, Thomas N.*
    *Barr, Christine Munn, Robert A. Bernhard*

Joshua S. Amsel   [ARGUED]
Weil, Gotshal & Magnes
767 Fifth Avenue – 27th Floor
New York, NY  10153

Teresa N. Cavenagh
Duane Morris
30 S. 17th Street
Philadelphia, PA   19103

Alan T. Gallanty   [ARGUED]
Kantor, Davidoff, Wolfe, Mandelker, Twomey & Gallanty
51 E. 42nd Street – 17th Floor
New York, NY  10017

Joseph J. Langkamer
Samuel W. Silver
Schander Harrison Segal & Lewis
1600 Market Street , Suite 3600
Philadelphia, PA   19103
    *Counsel for Appellee Ronald L. Altman*

_____

OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

This case arises from a now-defunct Ponzi scheme. The defendants are MB Investment Partners, Inc. ("MB"), a registered investment adviser, and various persons affiliated with MB. The fraudulent scheme was perpetrated by Mark Bloom while he was an employee and officer of MB, through a hedge fund called North Hills, L.P. ("North Hills") that Bloom controlled and managed outside the scope of his responsibilities at MB. Bloom was arrested and indicted in the Southern District of New York in 2009 on a variety of charges relating to the Ponzi scheme, by which time most of the money invested in North Hills was gone. Plaintiffs Barry J. Belmont, Philadelphia Financial Services LLC ("PFS"),[1] Thomas J. Kelly, Jr. and his wife Frances R. Kelly, and Gary O. Perez (collectively, the "Investors") brought suit in the Unites States District Court for the Eastern District of Pennsylvania against MB, certain of its officers and directors, including Bloom, and one of its employees, Robert L. Altman, in an effort to recover money they had lost at the hands of Bloom.

The Investors offered various theories of liability under both federal and state law, alleging (1) controlling person liability under Section 20(a) of the Securities and

_____

[1] PFS is a Pennsylvania limited liability company that serves as the personal investment vehicle for its sole member, John F. Wallace.

4

Exchange Act (the "Exchange Act"), (2) negligent supervision, (3) violations of Securities and Exchange Commission ("SEC") Rule 10b-5, (4) violations of the Pennsylvania Unfair Trade Practice and Consumer Protection Law (the "UTPCPL"), and (5) breach of fiduciary duty. The District Court dismissed all of the claims against Altman and, following discovery, granted summary judgment to all of the remaining defendants on all of the Investors' claims. For the reasons that follow, we will affirm in part and vacate in part the District Court's orders and will remand the case for a trial on the Investors' claims against MB for violations of Rule 10b-5 and the UTPCPL.

## I.   BACKGROUND

### A.   *Facts*[2]

#### 1.   *The Parties*

Defendant MB is a registered investment adviser previously known as Munn Bernhard & Associates, Inc. It is based in New York and registered to do business in Pennsylvania. As a registered investment adviser, MB managed client investments by trading securities on stock

---

[2] In accordance with our standard of review, *see infra* note 17, we set forth the facts in the light most favorable to the Investors. *See Funk v. CIGNA Grp. Ins.*, 648 F.3d 182, 190 (3d. Cir. 2011) ("Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." (internal quotation marks omitted)).

exchanges through custodial trading accounts held by third parties, such as Charles Schwab & Co., Inc. MB's primary investment focus was on large-capitalization stocks. It ceased operations in June 2009, following the discovery of the North Hills fraud and Bloom's arrest.

Defendants Robert Machinist and Robert L. Altman (together with MB, the "MB Defendants") were executives working at MB during the period that Mark Bloom also worked there. Machinist was the chairman of MB's board of directors, and the chief operating officer and a co-managing partner of MB,[3] and he owned 14 percent of the capital stock of its parent company, Centre MB Holdings, LLC ("CMB"). Machinist was listed as a "control person"[4] in MB's Form ADV, the reporting form used by investment advisers to register with both the SEC and state securities authorities. Altman was a senior managing director,[5] partner, and portfolio manager of MB. Bloom was also an executive at MB, serving as president, co-managing partner (with Machinist), and chief marketing officer, and he too owned 14

---

[3] Although Machinist, Altman and Bloom held the titles of "partner," MB was a New York corporation rather than a partnership at all times relevant to this dispute.

[4] The term "control" in Form ADV is defined as "the power, directly or indirectly, to direct the management or policies of a person, whether through ownership of securities, by contract, or otherwise." (App. at 1130.)

[5] Altman held the title of "director" as a member of MB's senior management team but was not a member of MB's board of directors.

percent of the capital stock of CMB. Bloom was also a member of MB's board of directors.[6]

Defendant Centre Partners Management, LLC ("Centre Partners") is a Delaware limited liability company that provides advisory and management services for various private equity investment funds, each of which is structured as a limited partnership composed primarily of investors otherwise unaffiliated with Centre Partners. Defendants Lester Pollack, William M. Tomai, and Guillaume Bébéar (together with Centre Partners and CMB, the "Centre Defendants") are Centre Partners executives. Pollack, Tomai, and Bébéar were, at all times relevant to this dispute, non-management members of MB's board of directors, with no role in the business's day-to-day operations, and they do not appear on MB's organizational chart. However, Pollack and Tomai are listed as control persons on MB's Form ADV.

Defendant CMB is a Delaware limited liability company formed by Centre Partners, Machinist, and Bloom to acquire a controlling interest in MB. In July 2004, Machinist, Bloom, and Centre Partners (though an affiliated fund) invested $14 million in CMB for the acquisition of MB, with Centre Partners as the largest shareholder, followed by Machinist and Bloom. CMB owned 57 percent of the capital stock of MB, and controlled the operations of MB through a contractual operating agreement. CMB is denominated as a control person on MB's Form ADV. After CMB acquired

---

[6] Although Bloom was named as a defendant in the Complaint, the District Court entered a default judgment against him for failure to appear, plead, or otherwise defend, and he is not a party to this appeal.

control of MB, it designated Bloom, Machinist, Pollack, Tomai, and Bébéar to serve as members of the MB board of directors.

Defendants P. Benjamin Grosscup, Thomas N. Barr, Christine Munn, and Robert A. Bernhard (together with Machinist, Bloom, Pollack, Tomai, and Bébéar, the "MB Directors") were all MB executives who also served as members of the MB board of directors. Grosscup, Barr, and Munn are listed as "control persons" in MB's Form ADV.[7]

Plaintiffs, the Investors, all had money in Bloom's North Hills fund, investing a total of approximately $4.4 million in North Hills from 2006 to 2008. Belmont and the Kellys were also MB clients and entered into advisory agreements with MB. PFS and Perez did not have any advisory agreement with MB.

2.      *Bloom and the North Hills Ponzi Scheme*

Bloom worked as a certified public accountant in the tax department of an accounting firm from 1979 to 1992. From 1992 to 2001, he worked for a hedge fund management company where he was responsible for marketing and client

---

[7] Bernhard is not listed as a control person because he ended his employment and resigned from the MB board of directors in connection with the July 2004 purchase of MB by CMB, although he continued to serve as an outside consultant to the company. Although CMB held majority voting control of MB, the minority shareholders were entitled to designate three directors under the terms of the company's Operating Agreement. Those directors were Grosscup, Barr, and Munn.

8

services. Bloom left the hedge fund in 2001, and became president of a registered investment adviser and broker-dealer affiliated with his former accounting firm. He resigned from that position and joined MB prior to the July 2004 acquisition of MB by CMB.

Bloom formed North Hills in 1997, as an enhanced stock index fund based on various stock indices. Bloom was the sole principal and managing member of North Hills Management, LLC, the general partner of North Hills, and he had sole authority over the selection of the fund's investments. Although North Hills was founded as a stock index fund, Bloom later described North Hills to investors as a "fund of funds" that invested in hedge funds and other well-managed funds and that provided financing to the widely-known retailer Costco. Between 2001 and 2007, Bloom raised approximately $30 million from 40 to 50 investors for the North Hills fund. He claimed that North Hills consistently generated investment returns of 10-15 percent per year without significant risk.

In fact, however, North Hills was a Ponzi scheme that Bloom used to finance his lavish personal lifestyle, and, over time, he diverted at least $20 million from North Hills for his own personal use. Bloom used those funds to acquire multiple apartments and homes, furnishings, luxury cars and boats, and jewelry, and to fund parties and travel.

Bloom also engaged in self-dealing beyond the money he converted from North Hills. For example, while acting as a third-party marketer for the Philadelphia Alternative Asset Fund ("PAAF"), he invested $17 million of North Hills's funds in PAAF, earning a lucrative commission for himself

9

without disclosing that conflict of interest to North Hills investors. When PAAF, and another company in which North Hills had invested, the futures and commodities broker Refco, Inc., collapsed due to separate frauds, Bloom misappropriated proceeds of legal settlements and residual payments made to North Hills as an unsecured creditor.

### 3. *Marketing of North Hills to the Investors*

In June 2006, Bloom met with plaintiff Belmont to introduce himself and to discuss the investment advisory services offered by MB. Bloom gave Belmont his MB business card and described the investment philosophy of MB. Bloom then discussed various investment funds, including North Hills, that he recommended as suitable for Belmont, supposedly based on Belmont's objectives.

In July 2006, John Wallace (the sole principal of plaintiff PFS) and Belmont met with Bloom and Altman. Altman repeated Bloom's praise for North Hills, and he suggested that MB's access to North Hills was a selling point for MB's advisory services.[8] Bloom and Altman presented Belmont with a proposed asset allocation that they had prepared on MB's letterhead.[9] Both Belmont and PFS

---

[8] Altman disputes that account of the meeting. He testified that he never commented on North Hills as an investment and that he did not say that access to North Hills was a selling point for MB.

[9] The Investors contend that the proposed asset allocation "recommend[ed] that Belmont invest 20% of the funds he entrusted to MB in North Hills." (Appellants' Opening Br. at 7 (citing App. at 955).) However, the exhibit

subsequently invested in North Hills. Belmont also became an investment advisory client of MB, with Altman serving as Belmont's portfolio manager and Bloom serving as his relationship manager. In February 2008, allegedly on Altman's advice, Belmont transferred $1 million from his MB-managed Charles Schwab account to North Hills, adding it to money he had already invested in that fund.[10]

Altman also served as portfolio manager for Thomas and Frances Kelly. He marketed North Hills to the Kellys as an investment option available through MB.[11]

Perez had no formal relationship with MB. He had, however, previously met Bloom and, in the fall of 2008, he telephoned him at MB's offices, seeking investment advice. Bloom recommended that Perez invest in North Hills.

---

to which the Investors refer does not mention North Hills by name, and the asset allocation at issue is simply labeled "Credit Arbitrage." (*See id.*)

[10] Altman disputes that account of the $1 million transfer. Altman testified that, when Belmont told him that he was nervous about the stock market in early 2008, Altman advised him concerning various money market investment options. Altman also testified that the direction to transfer the funds from the MB-managed Schwab account to North Hills was relayed to him by Bloom.

[11] Altman contends that he did not market North Hills to the Kellys. He says that he was not their portfolio manager and that the Kellys ultimately signed some 13 separate advisory agreements for different MB products, none of which was North Hills.

11

### 4. The Defendants' Roles with Respect to MB and North Hills

Bloom operated North Hills the entire time that he was an executive of MB, until his arrest in February 2009. Although the business address for North Hills was one of Bloom's residences in Manhattan, he made no attempt, while working at MB, to conceal his activities related to North Hills. Investments in North Hills were administered by Bloom and other MB personnel, using MB's offices, computers, filing facilities, and office equipment. MB support staff sometimes carried out tasks related to North Hills.

MB officers and directors were aware that Bloom was operating North Hills while he was also working as an investment adviser at MB. As a result of financial dealings with North Hills beginning in 2004, Machinist was familiar with Bloom's control over North Hills. Machinist participated in a number of business ventures with North Hills, including North Hills's investment in a company called DOBI Medical International Inc. ("DOBI"). Machinist also attended meetings in which Bloom marketed North Hills and described it as an MB fund. Machinist's successor as MB's CEO, Michael Jamison, was also aware of North Hills, and, in December 2007, transferred funds to North Hills Management, the general partner of North Hills, as part of a personal loan to Bloom. Bloom's position at North Hills was also disclosed in a 2005 prospectus of DOBI, in connection with North Hills's investment in the stock of that company, and defendants Machinist, Grosscup, Barr, Bernhard, and Munn were investors in DOBI and had access to the prospectus.

As an investment adviser, MB was required by the Investment Advisers Act of 1940 (the "Advisers Act"), and by Rules promulgated under the Advisers Act, and by the Pennsylvania Securities Act to supervise its personnel so as to prevent violations of the Advisers Act.[12] However, during the period of the North Hills fraud, MB did not have in place basic compliance procedures employed throughout the investment advising industry to identify and prevent fraud and self-dealing by MB employees and affiliates. Compliance weaknesses permitted Bloom to avoid required disclosures to MB about North Hills as a personal investment vehicle. MB officers and directors failed to make basic inquiries about Bloom's operation of North Hills, and did not collect any information on North Hills or monitor sales of investments in North Hills to MB's own customers.[13]

_____

[12] *See* 15 U.S.C. § 80b-3(e) (allowing the SEC to censure, or suspend or deny the registration of, an investment adviser, where such adviser "or any person associated with such investment adviser" violates the federal securities laws); Rule 204A-1, 17 C.F.R. § 275.204A-1 (requiring an investment adviser to establish a code of ethics to ensure that employees comply with the federal securities laws); Rule 206(4)-7(a), 17 C.F.R. § 275.206(4)-7(a) (requiring an investment adviser to establish compliance policies and procedures to ensure compliance with the securities laws); 70 Pa. Cons. Stat. Ann. § 1-102(j) (defining investment adviser for state law purposes); *id.* § 1-305(a)(v) (authorizing the suspension or revocation of the Pennsylvania registration of an investment adviser that fails to comply with the federal securities laws including the Advisers Act).

[13] MB disputes these characterizations of its oversight, arguing that it did have in place written compliance policies

The Centre Defendants were also aware of North Hills as a result of a due diligence investigation that the firm conducted on Bloom in relation to his personal investment in a fund managed by Centre Partners. The Centre Defendants believed that North Hills was Bloom's "family investment vehicle" (App. at A515), and that it was "not an actual business" (App. at 528). The background report that the Centre Defendants obtained on Bloom stated that Bloom was the "sole proprietor of North Hills Management, LLC, which manages the investment partnership North Hills LP," and that Bloom "work[ed] approximately eight hours per month for this fund of funds overseeing asset allocation and reporting performance."[14] (App. at 946.) Tomai and Bébéar were also

and procedures. As part of MB's compliance program, employees (including Bloom) were required to provide annual certifications listing all of the securities they owned, and were prohibited from managing accounts for third parties who were not MB clients. MB places the blame on Bloom and contends that, while Bloom provided those annual certifications, he "falsely and misleadingly omitted his ownership or operation of North Hills." (MB Defendants' Br. at 7-8). Bloom did omit any reference to North Hills or any other trading accounts in his annual certifications to MB. However, shortly after Bloom was arrested, the SEC investigated MB and issued a deficiency letter detailing compliance failures.

[14] The Centre Defendants contend that the facts set forth in the background check were "consistent with [their] understanding of North Hills as Mr. Bloom's family, or personal investment vehicle." (Centre Defendants' Br. at 19 (citing App. at 2621-23).)

aware of North Hills, and of Bloom's control and operation of the fund, based on an investor questionnaire Bloom completed prior making his personal investment in the Centre Partners fund.

### 5. *The Downfall of Bloom and MB*

Ironically, losses suffered by North Hills because of the PAAF and Refco frauds ultimately led to the collapse of the North Hills fraud. In 2008, after Bloom was forced to disclose those losses, two large investors in North Hills requested a full redemption of their investments. By that time, most of the money that had been invested in North Hills was gone, and Bloom could only return a portion of those investors' funds. It is not clear from the record in this case when federal authorities began to investigate Bloom, but he was arrested on February 25, 2009, and he was terminated by MB that same day. On July 30, 2009, the U.S. Attorney for the Southern District of New York filed an Information against Bloom that documented in detail a wide-ranging scheme to defraud North Hills investors, beginning in 2001, as well as Bloom's sale of illegal tax shelters while he was still practicing as an accountant.

Bloom promptly pleaded guilty to all of the counts in the Information, including charges that he had diverted at least $20 million from the operating account of North Hills for his own use, had misrepresented the value of North Hills investors' capital accounts in their monthly statements, had solicited funds from new North Hills investors in 2007 and 2008 to honor redemption requests from prior North Hills investors, had committed securities fraud in connection with the sale of interests in North Hills, and had committed mail

15

and wire fraud and laundered money invested in North Hills. Bloom is still the subject of a number of criminal and civil proceedings brought by the United States and by North Hills investors.[15]

After the North Hills fraud was exposed, MB, which had been losing money and was already in some financial distress, was forced to cease operations in June 2009.

B.    *Procedural History*

The Investors filed their original Complaint in this action on October 28, 2009.  They filed an Amended Complaint on March 30, 2010, alleging (1) securities fraud in violation of Rule 10b-5 on the part of Bloom, Altman, and MB, (2) violation of the Pennsylvania UTPCPL by Bloom, Altman, and MB, (3) breach of fiduciary duty by Bloom, Altman, and MB, (4) controlling person liability under Section 20(a) of the Exchange Act against the MB Directors, and (5) negligent supervision against the MB Directors.

On April 13, 2010, Defendants filed motions to dismiss the Amended Complaint under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, arguing that the

---

[15] *See U.S. Commodity Future Trading Comm'n v. Bloom*, Civ. A. No. 09-1751 (S.D.N.Y); *United States v. Bloom*, Crim. A. No. 09-MAG-501 (S.D.N.Y); *In re North Hills, L.P.*, No. 09-13035-AJG (Bankr. S.D.N.Y.); *Alexander Dawson Found. v. Bloom*, Index No. 603590/08 (N.Y. Sup. Ct.).  Appellees are not parties to those proceedings, and the Investors state that those proceedings do not involve the issues raised in this appeal.

Investors had failed to state a claim and had not pled the elements of fraud with the required particularity. On June 10, 2010, the District Court dismissed all of the Investors' claims against Altman. However, the Court denied all of the other Defendants' motions to dismiss.

On October 31, 2011, following discovery and an unsuccessful attempt at settlement, the MB Defendants (excluding Altman), the Centre Defendants, and the MB Directors filed motions for summary judgment. On January 5, 2012, the District Court granted summary judgment to all of the remaining Defendants, with the exception of Bloom, on all of the Investors' claims. Because Bloom had previously failed to appear, plead, or otherwise defend, the Court gave the Investors leave to move for default judgment against him, which they did. On February 17, 2012, the Court entered a default judgment against Bloom and in favor of the Investors in the amount of approximately $5.7 million.

The June 10, 2010 dismissal of Altman and the January 5, 2012 grant of summary judgment to the other Defendants became final upon the entry of the default judgment against Bloom. This timely appeal followed.[16]

---

[16] Investors appeal both that portion of the June 10, 2010 Order granting Altman's motion to dismiss and the January 5, 2012 Order granting the motions for summary judgment by the MB Defendants, the Centre Defendants, and Grosscup, Barr, Munn, and Bernhard.

## II.   DISCUSSION[17]

[17] The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. §§ 77u, 78aa, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). The District Court alternatively had jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), because there was complete diversity of citizenship – the Investors are all citizens of the Commonwealth of Pennsylvania, and Defendants are all citizens of the State of New York – and the amount in controversy exceeds $75,000. We have jurisdiction under 28 U.S.C. § 1291.

Our review of a district court's order granting a motion to dismiss is plenary. *Ill. Nat'l Ins. Co. v. Wyndham Worldwide Operations*, 653 F.3d 225, 230 (3d Cir. 2011). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

We also exercise plenary review over the District Court's grant of summary judgment. *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 792 (3d Cir. 2010). "[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving person is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)) (internal quotation marks omitted). A factual dispute is genuine "if the

The Investors press on appeal all of the theories of liability they argued before the District Court. First, they contend that the MB Directors and the Centre Defendants are liable for the North Hills fraud as "controlling persons" under Section 20(a) of the Exchange Act, and that the MB Directors are also liable under common law principles of negligent supervision. Second, they argue that Altman is directly liable for securities fraud, under both Rule 10b-5 and the Pennsylvania UTPCPL, and that Altman's and Bloom's Rule 10b-5 and UTPCPL violations should be imputed to MB. Third, they argue that Altman and MB are liable for breach of fiduciary duty. We address each of those theories of liability in turn.

> A.  *Claims Against The MB Directors And The Centre Defendants*[18]

---

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[18] We note at the outset that Bernhard was entitled to summary judgment on those claims because he resigned as both an employee and director, and became a consultant, at the closing of the acquisition of MB by Centre Partners (through CMB), Machinist, and Bloom in July 2004. Bernhard was therefore neither an officer nor a director of MB, and thus was not in any position of "control" or "supervision" over either Bloom or MB, during the relevant timeframe. *See supra* note 7. We therefore affirm the District Court's grant of summary judgment to Bernhard on that basis.

1.   *Section 20(a) Controlling Person Claim Against the MB Directors and the Centre Defendants*

The District Court granted summary judgment to the MB Directors and the Centre Defendants on the Investors' controlling person claim, finding no evidence of "culpable participation" by those defendants in the North Hills fraud, either in the form of active participation or intentional inaction.  (App. at 13-14.)   The Investors argue that the "reckless failure" of the MB Directors and the Centre Defendants to monitor Bloom's activities made them "culpable participants" in Bloom's fraud.   (Appellants' Opening Br. at 36.)

Section 20(a) of the Exchange Act provides that

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable ... , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).[19]   Section 20(a) thus opens the possibility of making "controlling persons jointly and severally liable

---

[19] Although § 20(a) governs the Investors' "controlling person" claims, we have said that "§ 20(b), not § 20(a), defines the general standard of lawfulness to which a

with the controlled person" for violations of the Exchange Act. *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 262, 275 (3d Cir. 2005). "Under the plain language of the statute, plaintiffs must prove not only that one person controlled another person, but also that the 'controlled person' is liable under the [Exchange] Act." *In re Alpharma Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004) (internal quotation marks omitted), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).

In addition to the statutory elements of controlling person liability, we have also held that, in order for secondary liability to attach under § 20(a), the defendant "must have been a 'culpable participant' in the 'act or acts constituting the violation or cause of action.'"[20] *SEC v. J.W. Barclay &*

controlling person must conform." *SEC v. J.W. Barclay & Co.*, 442 F.3d 834, 844 n.14 (3d Cir. 2006) (citing *SEC v. Coffey* 493 F.2d 1304, 1318 (6th Cir. 1974)). Section 20(b) provides that "[i]t shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person." 15 U.S.C. § 78t(b).

[20] We derived that requirement from the legislative history of § 20(a), comparing an "insurer's liability" standard proposed by the Senate, with the "fiduciary standard" proposed by the House and ultimately adopted in the text of § 20(a). We thus determined that Congress did not intend for controlling persons to be the "insurer against the fraudulent activities of another," but rather that "what Congress did intend was to impose liability on those who were controlling persons and who were in some meaningful sense culpable

21

*Co.*, 442 F.3d 834, 841 n.8 (3d Cir. 2006) (citing *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 889-90 (3d Cir. 1975)); *see also Sharp v. Coopers & Lybrand*, 649 F.2d 175, 185 (3d Cir. 1981), *overruled on other grounds by In re Data Access Sys. Sec. Litig.*, 843 F.2d 1537 (3d Cir. 1988) (en banc) ("One element of any case imposing liability under § 20(a) is 'culpable participation' in the securities violation."). Examples of such culpable participation include an executive's transfer of assets to himself so that the brokerage firm he controlled would be unable to pay a penalty to the SEC, *see J.W. Barclay & Co.*, 442 F.3d at 841 n.8, and a broker-dealer's "active participation" in a scheme to induce investors to purchase stock in an insolvent company in which the role of the broker-dealer and its sole shareholder "was not merely that of a facade for fraud but rather one of a culpable

---

participants in the fraud perpetrated by the controlled persons." *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 885 (3d Cir. 1975) (internal quotation marks omitted). Notwithstanding our articulation of that culpable participation requirement, a difference of opinion has emerged among district courts of this Circuit as to the pleading requirements for a § 20(a) claim. *Compare In re Able Labs. Sec. Litig.*, No. 05-2681, 2008 WL 1967509, at *29 (D.N.J. Mar. 24, 2008) ("[T]he Third Circuit does not require that culpable participation be pled in order to establish controlling person liability."), *with In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 588 (D.N.J. 2001) (noting that culpable participation is an element of a § 20(a) claim when deciding a motion to dismiss). Because we hold that the Investors have failed to satisfy the culpable participation requirement for purposes of summary judgment, we need not, and do not, resolve the pleading issue at this time.

confederate," *Straub v. Vaisman & Co., Inc.*, 540 F.2d 591, 596 (3d Cir. 1976).

The Investors point to no acts by the MB Directors in furtherance of the North Hills fraud, but rather seek to proceed on a theory of inaction. "To impose secondary liability on a controlling person for his inaction, the plaintiff must prove that the inaction 'was deliberate and done intentionally to further the fraud.'" *Sharp*, 649 F.2d at 185 (quoting *Rochez Bros.*, 527 F.2d at 890). The Investors contend that culpable participation "may be premised on inaction[] ... if it is apparent that the inaction intentionally furthered the fraud *or prevented its discovery*." (Appellants' Opening Br. at 37 (quoting *Rochez Bros.*, 527 F.2d at 890 (emphasis added in quotation) (internal quotation marks omitted).) The Investors thus appear to suggest that any inaction that prevented the discovery of the fraud is sufficient for culpable participation.

However, it is clear from *Rochez Brothers* that the requirement that the inaction be intentional applies both to furthering the fraud *and* to preventing its discovery, and that knowledge of the underlying fraud is required in either case. "[I]naction alone cannot be a basis for liability," *Rochez Bros.*, 527 F.2d at 890, and a § 20(a) claim based on inaction fails if the controlling person "had no knowledge of [the controlled person's] fraudulent acts and did not consciously intend to aid" the controlled person, *id.* (internal quotation marks omitted). Culpable participation requires knowledge because, "[i]n order to be a participant, the defendant must have some actual knowledge of the fraudulent activity taking place or knowledge must be imputed to him or her… ." *Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*,

23

792 F. Supp. 2d 328, 341 (D. Conn. 2011) (internal quotation marks omitted); *see also id.* (noting also that "knowledge is a first step in proving active participation" (internal quotation marks omitted)). The Investors have not alleged that the MB Directors or the Centre Defendants knew of the North Hills fraud, and in fact they concede a lack of knowledge in that "MB's compliance officers failed to follow up on significant 'red flags' that, if investigated, would have undoubtedly indentified Bloom's fraud and prevented Investors' losses." (Appellant's Opening Br. at 40.)

The Investors argue, however, that "because liability is secondary and not primary, a plaintiff need only [prove] a state of mind approximating recklessness … and not the sort of knowing misconduct that would be required to state a primary violation claim under Section 10(b)." (Appellants' Opening Br. at 37 (citation and internal quotation marks omitted).) They primarily rely on an unreported district court case, *Lautenberg Foundation v. Madoff*, No. 09-816, 2009 WL 2928913, at *15 (D.N.J. Sept. 9, 2009), for the proposition that "reckless failure to detect the fraud through enforcement of a reasonably adequate system of internal controls establishes ... participation in the fraud for purposes of [a] Section 20(a) claim." (Appellants' Opening Br. at 38.)[21] As they see it, the failure of the MB Directors and the

---

[21] The Investors' reliance on *Lautenberg Foundation* at this stage of the proceedings concerning their § 20(a) claims is somewhat misplaced, because the quoted language describes the district court's view of the pleading standard necessary to survive a motion to dismiss, and not the proof required to survive a motion for summary judgment. *See Lautenberg Found.*, 2009 WL 2928913, at *15 (concluding

Centre Defendants to monitor Bloom's activity with respect to North Hills, and in particular their failure to install an effective compliance system at MB, satisfies that recklessness standard.

That approach is problematic. To begin with, the Investors' contention that they need only prove recklessness because § 20(a) liability is "secondary and not primary" is contrary to the general principle that, when liability is secondary or derivative, a more culpable *mens rea*, not a lesser one, is required. *See, e.g., MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) (noting that secondary liability for copyright infringement requires intentional inducement of direct infringement); *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854 (1982) (holding that secondary liability for trademark infringement arises when a manufacturer or distributor intentionally induces another to infringe); *Vita-Mix Corp. v. Basic Holding, Inc.,* 581 F.3d 1317, 1328 (Fed. Cir. 2009) (noting that secondary liability for patent infringement requires a showing that the defendant "knowingly induced the infringing acts" with "a specific intent to encourage another's infringement of the patent"); *Decker v. SEC*, 631 F.2d 1380, 2387 n.12 (10th Cir. 1980) (noting that many courts have concluded that secondary liability for securities law violations requires either intent to aid and abet or knowledge of the underlying violation).

In addition, contrary to the Investors' contention, there is no support for the proposition that reckless inaction without knowledge of the underlying fraud is sufficient to establish

only that "the Complaint satisfactorily pleads all elements of a prima facie control person claim").

25

culpable participation for purposes of a § 20(a) claim. The discussion in *Lautenberg Foundation* does not appear to go that far. *See Lautenberg Found.*, 2009 WL 2928913, at *14 ("[T]he Complaint adequately pleads that [Defendant] knew or should have known that [his company] was engaging in a massive, multi-billion dollar Ponzi scheme."); *id.* at *15 ("While mere inaction is not enough to rise to culpable participation, this Complaint pleads more than that."). However, to the extent that that case can be read to suggest that knowledge of the underlying securities law violation is not required, we expressly reject it as incompatible with the "culpable participation" standard we articulated in *Rochez Brothers*.

Moreover, even if reckless inaction on the part of controlling persons, without knowledge of the underlying fraud, were sufficient to satisfy the culpable participation requirement, that standard is not met in this case. A failure to oversee the enforcement of compliance protocols does not necessarily constitute recklessness for purposes of a § 20(a) claim. *Cf. In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539-40 (3d Cir. 1999) (noting that recklessness for purposes of Rule 10b-5 requires "an extreme departure from the standards of ordinary care" and that "claims essentially grounded on corporate mismanagement are not cognizable under federal law" (citation and internal quotation marks omitted)); *Henricksen v. Henricksen*, 640 F.2d 880, 885 (7th Cir. 1981) (acknowledging that the defendant "did not properly follow its own compliance rules" but holding that "the technical lack of compliance in these matters ... would not have constituted a violation of Section 20(a)"). The fact that sloppy compliance practices at MB may have resulted in a lack of knowledge about Bloom's activities at North Hills is thus

26

insufficient to establish culpable participation for purposes of § 20(a) liability.[22]

As the District Court noted, "the only answer to the question of what the [MB Directors and the] Centre Defendants did that intentionally furthered the fraud of Bloom is nothing." (App. at 16.) Under the culpable participation standard that we articulated in *Rochez Brothers*, that answer is fatal to a § 20(a) claim, and the District Court properly granted summary judgment to the MB Directors and the Centre Defendants on that claim.

---

[22] The recklessness alleged in this case also bears little resemblance to that in *Lautenberg Foundation*. In that case, the defendant was the chief compliance officer and general counsel of the company that perpetrated a massive Ponzi scheme. 2009 WL 2928913, at *2. The Court therefore held that, "[a]ssuming the truth of the allegations, his reckless failure to detect fraud through enforcement of a reasonably adequate system of internal controls establishes his participation in the fraud for purposes of the Section 20(a) claim[]" because he was "charged with the responsibility and authority to run [the company] in accordance with the law. *Id.* at *15. In this case, none of the MB Directors or Centre Defendants worked for, let alone had any compliance responsibilities at, North Hills, the entity at which the actual fraud occurred, so that their alleged failure to instill a culture of compliance at MB cannot constitute recklessness as it related to North Hills.

### 2. Negligent Supervision Claim Against the MB Directors

The District Court granted summary judgment to the MB Directors on the Investors' negligent supervision claim because "[t]he cases applying this tort under Pennsylvania law repeatedly note that liability is imposed upon an employer" (*Id*. at 18), and "it does not follow that [Bloom's] employment with MB turned individual board members of MB into Bloom's employers as well" (*id.* at 19). The District Court also held that, "[t]o succeed on this claim, there must be evidence that the individuals charged with negligent supervision knew or should have know that Bloom would operate North Hills ... as a Ponzi scheme" (*Id*. at 19), and that, absent a showing of such knowledge, "there is no evidence that Bloom's fraud was reasonably foreseeable." (*Id.*).

The Investors assert in response that "[p]ersons vested with supervisory responsibilities like the individual MB and Centre [defendants], who are corporate officers and directors of MB, can be liable for negligent supervision" under Pennsylvania law. (Appellants' Opening Br. at 27.) They further argue that the failure of the MB Directors to monitor Bloom's activities, when those directors were aware that he was operating North Hills as a separate venture, rendered the fraud foreseeable as a matter of law. Neither of the Investors' arguments is persuasive.

### i. Negligent Supervision Claims Against Corporate Directors

To recover for negligent supervision under Pennsylvania law, a plaintiff must prove that his loss resulted from (1) a failure to exercise ordinary care to prevent an

intentional harm by an employee acting outside the scope of his employment, (2) that is committed on the employer's premises, (3) when the employer knows or has reason to know of the necessity and ability to control the employee.[23]

----

[23] Pennsylvania cases that recognize vicarious liability for negligent supervision draw on both the Restatement (Second) of Agency and the Restatement (Second) of Torts. *See, e.g.*, *Dempsey v. Walso Bureau, Inc.*, 246 A.2d 418, 419-20 (Pa. 1968); *Heller v. Patwil Homes, Inc.*, 713 A.2d 105, 107 (Pa. Super. Ct. 1998). Section 213 of the Restatement (Second) of Agency provides, in relevant part:

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless: … [b] in the employment of improper persons or instrumentalities in work involving risk of harm to others; or [c] in the supervision of the activity; or [d] in permitting, or failing to prevent, negligent or other tortious conduct, by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

*Id.* Section 317 of the Restatement (Second) of Torts provides:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others … if
>
> (a) the servant (i) is upon the premises in possession of the master or upon which the

*Dempsey v. Walso Bureau, Inc.*, 346 A.2d 418, 420 (Pa. 1968); *Heller v. Patwil Homes, Inc.*, 713 A.2d 105, 107-08 (Pa. Super. Ct. 1998).

Negligent supervision requires the four elements of common law negligence, *i.e.*, duty, breach, causation, and damages. *Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 42 (Pa. Super. Ct. 2000) (citing Restatement (Second) of Agency § 213 cmt. a). It is specifically predicated on two duties of an employer: the duty to reasonably monitor and control the activities of an employee, and the duty to abstain from hiring an employee and placing that employee in a situation where the employee will harm a third party.[24] *See*

> servant is privileged to enter only as his servant, or (ii) is using a chattel of the master, and (b) the master (i) knows or has reason to know that he has the ability to control his servant, and (ii) knows or should know the necessity and opportunity for exercising such control.

*Id.* The MB Defendants argue that that provision "relates solely to *bodily* harm, not the purely economic harm at issue here." (MB Defendants' Br. at 20 (citing *Semrad v. Edina Realty, Inc.*, 493 N.W.2d 528, 534 (Minn. 1992) ("Nothing in section 317 calls for its application in a case involving economic loss only.")).) However, Pennsylvania does not appear to limit the tort of negligent supervision to cases of physical injury. *See Heller*, 713 A.2d at 109 (considering an "investment scam").

[24] We have also described negligent supervision under Pennsylvania law as existing "where the employer fails to exercise ordinary care to prevent an intentional harm to a

*Hutchinson v. Luddy*, 742 A.2d 1052, 1059-60 (Pa. 1999) (affirming the applicability of common law negligence and discussing the duty of an employer articulated in Section 317 of the Restatement).

Negligent supervision differs from employer negligence under a theory of *respondeat superior*.

> A claim for negligent supervision provides a remedy for injuries to third parties who would otherwise be foreclosed from recovery under the principal-agent doctrine of respondeat superior because the wrongful acts of

third party which (1) is committed on the employer's premises by an employee acting outside the scope of his employment and (2) is reasonably foreseeable." *Petruska v. Gannon Univ.*, 462 F.3d 294, 309 n.14 (3d Cir. 2006) (internal quotation marks omitted). The harm caused by the employee must be reasonably foreseeable because "[l]iability under Section 213 [of the Restatement [Second] of Agency] exists only if all the requirements of an action of tort for negligence exist." *Gigli v. Palisades Collection, L.L.C.*, No. 06-1428, 2008 WL 3853295, at *16 (M.D. Pa. Aug. 14, 2008) (internal quotation marks omitted) (citing *Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 42 (Pa. Super. Ct. 2000)). The definitions of negligent supervision set forth in *Dempsey*, *supra*, and *Petruska* are the same, but the former emphasizes the foreseeability of the need to control the employee, while the latter stresses the foreseeability of the harm the employee causes. We discuss these foreseeability requirements *infra* Part II.A.2.ii.

> employees in these cases are likely to be outside the scope of employment or not in furtherance of the principal's business."

*In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, No. 05-3588, 2007 WL 2541216, at *29 (E.D. Pa. Aug. 29, 2007) (citing *Heller*, 713 A.3d at 107).

The question of whether a corporate director, rather than a corporation as employer, may be held liable for negligent supervision can be resolved by asking whether a director owes a duty to third parties to supervise the corporation's culpable employee. *See Harris v. KFC U.S. Props., Inc.*, No. 10-3198, 2012 WL 2327748, at *6 n.8 (E.D. Pa. June 18, 2012) (noting that "in cases alleging negligent hiring and supervising, the disputed issue is typically whether a duty to a third party exists"). It is true that corporate directors are often said to have, as part of their fiduciary duty of loyalty, a duty to act in good faith for the benefit of the corporation, *see Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (describing "the requirement to act in good faith" as "a subsidiary element[,] i.e., a condition, of the fundamental duty of loyalty" (internal quotation marks omitted)), and that, in turn, has been held to incorporate a duty of oversight, *see In re Caremark Intern., Inc., Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996) (positing liability due to "a sustained or systematic failure of the board to exercise oversight – such as an utter failure to attempt to assure [that] a reasonable information and reporting system exists"). But that has never been understood as placing on directors the responsibility for day-to-day supervision of employees. On the contrary, those quotidian tasks are the work of employee-supervisors, not the board of directors. *See*

32

*id.* (noting that "require[ing] directors to possess detailed information about all aspects of the operation of the enterprise[] ... would simpl[y] be inconsistent with the scale and scope of efficient organization size in this technological age").

The fiduciary duties of the board are of a different character entirely. *See Winer Family Trust v. Queen*, 503 F.3d 319, 338 (3d Cir. 2007) ("Under Pennsylvania law, corporate directors owe fiduciary duties ... 'solely to the business corporation ... [that] may not be enforced directly by a shareholder or by any other person or group.'" (quoting 15 Pa. Cons. Stat. Ann. § 1717)). Consequently, "in the absence of special circumstances it is the corporation, not its owner or officer, who is the principal or employer, and thus subject to vicarious liability for torts committed by its employees or agents." *Meyer v. Holley*, 537 U.S. 280, 286 (2003). "[A] corporate employee typically acts on behalf of the corporation, not its owner or officer," *id.*, so that there is no agency relationship between an officer or director and an employee.

Virtually all of the cases in which liability for negligent supervision has been found under Pennsylvania law concern corporations and their employees.[25] *See, e.g.,*

---

[25] The Investors rely heavily on *Hutchinson v. Luddy*, 742 A.2d 1052 (Pa. 1999), for the proposition that "claims for negligent supervision may include 'superiors' of servants who commit wrongful acts." (Appellants' Opening Br. at 28 (citing *Hutchinson*, 742 A.2d at 1059).) The Investors also argue that "the court in *Hutchinson* focused on who had 'supervisory responsibility or a real right to consider the

issues of [the employee's] retention.'" (*Id.* (quoting *Hutchinson*, 742 A.2d at 1057.) *Hutchinson* concerned claims of child molestation against a priest in the Roman Catholic Diocese of Altoona-Johnstown. The Court found that the bishop (as well as the Diocese) could be held liable for negligent supervision because he "knew for certain that [the priest] had a propensity for pedophilic behavior and [was] aware of several specific instances of such conduct." *Hutchinson*, 742 A.2d at 1059.

*Hutchinson*, however, is inapposite. The Investors quote the phrase "supervisory responsibility or a real right to consider the issue of [the employee's] employment" (which the trial court in *Hutchinson* had used as part of a jury instruction) entirely out of context. That phrase was intended to distinguish the supervisory role of the Diocese and the bishop from that of the priest's former parish and pastor, after the priest had left the parish and was employed directly by the Diocese. *See id.* at 1056-57. The statement does not suggest general liability for those in a "supervisory" capacity, and all the cases cited by the *Hutchinson* court as "analogous," *id.* at 1058, involve a defendant that was a corporate entity and harm that was caused by an employee or agent of that entity. *See id.* at 1058-59 (discussing *Dempsey*, 246 A.2d at 418 (security agency defendant for assault by employee guard); *Golden Spread Council, Inc. v. Akins*, 926 S.W.2d 287 (Tex. 1996) (local branch of Boy Scouts of America defendant for sexual molestation by scoutmaster); *Macquay v. Eno*, 662 A.2d 272 (N.H. 1995) (school district defendant for employees' abuse of students)). Also, "in *Hutchinson*, liability clearly was premised upon the master-servant relationship between the priest and his superiors as well as the special relationship between the parishioner, on the one hand,

34

*Dempsey*, 248 A.3d at 420-23 (discussing various early cases of negligent supervision, in all of which the defendant was a corporate employer); *Harris*, 2012 WL 2327748, at *7 (considering liability of fast food company for assault by employee on a customer who was slow in ordering); *Corr. Med. Care*, 2008 WL 248977, at *15-16 (considering liability of employer for failure to supervise employees conducting private investigations); *In re Am. Investors Life Ins. Co.*, 2007 WL 2541216, at *29 (dismissing negligent supervision claims against insurer for fraudulent sales practices by employees because they were acting at the employer's direction). We take that clear feature to be dispositive, so that when, as in this case, "Plaintiff alleges in the Complaint that [Defendant] is ... not an employer ... 'negligent supervision' is not a viable theory of liability." *Quandry Solutions, Inc. v. Verifone Inc.*, No. 07-97, 2007 WL 655606, at *5 (E.D. Pa. Mar. 1, 2007); *cf. id.* ("In contrast to the employer-employee context, there is no general duty for a parent corporation to supervise its subsidiary; absent a piercing of the corporate veil, a parent corporation is not normally liable for wrongful acts or contractual obligations of a subsidiary ... ." (internal quotation marks omitted)).

As the District Court noted, the Investors brought their negligent supervision claim only against the MB Directors,

---

and the superiors of the church, on the other hand." *F.D.P. ex rel. S.M.P. v. Ferrara*, 804 A.2d 1221, 1229 (Pa. Super. Ct. 2002). Bloom did not stand in the same relationship to the MB Directors as a priest to his bishop, nor do the Investors stand in the same sort of relationship to the MB Directors as parishioners to the hierarchy of a Catholic Diocese.

and not against MB as Bloom's employer,[26] and "[i]t does not follow that [Bloom's] employment with MB turned individual board members of MB into Bloom's employers as well." (App. at 19.) As a result, the Investors' claim against the directors under a theory of negligent supervision is not viable, notwithstanding their efforts to cast the directors in a "supervisory" role.[27]

[26] The Investors have included MB as one of the "MB Parties" against whom they assert liability for negligent supervision in their brief on appeal. (*See* Appellants' Opening Br. at 5, 29, 35.) However, the Amended Complaint alleged liability "[f]or Negligent Supervision By Officers and Directors" only against the MB Directors. (*See* App. at 103.) The reasons for that pleading choice are not clear from the record, but MB was not the subject of the allegations in the Investors' negligent supervision claim.

[27] The Investors allege that Machinist occupied a different supervisory position from the other MB Directors in that, as MB's chief operating officer, he was Bloom's "immediate superior." (Appellants' Opening Br. at 29.) However, the extent of Machinist's supervisory authority over Bloom is not clear from the record. Machinist and Bloom were co-managing partners of MB and held the same percentage ownership in the company, suggesting that they may have been effectively of equal rank in the organization. But even if Machinist had a supervisory role greater than that of the other MB Directors, the Investors' negligent supervision claim against him still fails based on a lack of foreseeability, as discussed *infra* Part II.A.2.ii.

### ii. Foreseeability Requirement for Negligent Supervision

Even assuming that corporate directors may be held liable as "supervisors," to prevail in their claim for negligent supervision, the Investors would also have to satisfy two separate foreseeability requirements. First, "[u]nder Pennsylvania law, ... an employer may be liable for negligence if it knew or should have known of the necessity for exercising control of its employee." *Devon IT, Inc. v. IBM Corp.*, 805 F. Supp. 2d 110, 132 (E.D. Pa. 2011) (citing *Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 39-40 (Pa. Super. Ct. 2000) (citing *Dempsey*, 246 A.2d at 422)). Second, the harm that the improperly supervised employee caused to the third party must also have been reasonably foreseeable. *Petruska v. Gannon Univ.*, 462 F.3d 294, 309 n.14 (3d Cir. 2006); *Mullen v. Topper's Salon & Health Spa, Inc.*, 99 F. Supp. 2d 553, 556 (E.D. Pa. 2000). The requirement that the employer foresee the need to supervise the employee comes from § 317 of the Restatement (Second) of Torts, *see supra* note 23, and the requirement that the harm itself is foreseeable comes from § 213 of the Restatement (Second) of Agency, which requires that all of the elements of the tort of negligence exist in order for liability for negligent supervision to attach, *see supra* note 24.

An employer knows, or should know, of the need to control an employee if the employer knows that the employee has dangerous propensities that might cause harm to a third party. *See Hutchinson*, 742 A.2d at 1057-58 (citing *Dempsey*, 246 A.2d at 423 (holding employer not liable where employee's act of "horseplay" while on the job did not suggest a propensity for violence)); *see also Coath v. Jones*,

419 A.2d 1249, 1250 (Pa. Super. Ct. 1980) (holding employer liable where employer should have known of employee's inclination to assault women)). A harm is foreseeable if it is part of a general type of injury that has a reasonable likelihood of occurring. *See Serbin v. Bora Corp., Ltd.*, 96 F.3d 66, 72 (3d Cir. 1996) ("The concept of foreseeability means the likelihood of the occurrence of the general type of risk rather than the likelihood of the occurrence of the precise chain of events leading to the injury.").

The Investors' negligent supervision claim fails both foreseeability tests. First, there is no reason that the MB Directors should have foreseen the need to supervise Bloom with respect to his operation of North Hills. An employer is under "no duty ... to discover, at its peril, the fraudulent machinations in which [an employee] was involved outside the scope of his employment." *Cover v. Cushing Capital Corp.*, 497 A.2d 249, 253-54 (Pa. Super. Ct. 1985). While some (and perhaps all) of the MB Directors were aware that Bloom was running North Hills as a hedge fund outside of MB, nothing in Bloom's conduct as an employee of MB suggested that Bloom would use North Hills to defraud investors. Nor could the MB Directors have learned of the fraud without considerable investigation, given Bloom's success at concealing the Ponzi-scheme nature of North Hills for almost ten years. For the same reasons, the Ponzi scheme and the harm that it would cause to North Hills investors were not reasonably foreseeable by the MB Directors.

As the District Court properly noted, the Investors "failed to submit any evidence that any [of the MB Directors] had reason to know at the time he was hired that Bloom was defrauding North Hills, L.P.'s investors" (App. at 20), and the

38

Investors merely speculate about what the MB Directors might have learned had they asked Bloom more questions. Because a detailed inquiry into an employee's personal history or outside activities is not generally required,[28] *see Dempsey*, 246 A.2d at 423 (finding no evidence that employer was negligent in investigating employees' past or that a more thorough investigation would have uncovered misconduct), the negligent supervision claim fails on the basis of foreseeability, as well as on the defendants' status as directors of MB rather than as Bloom's employers, and the District Court properly granted summary judgment to the MB Directors on that claim.

B.    *Claims Under Rule 10b-5 And The UTPCPL*

1.    *Rule 10b-5 Violations*

The District Court dismissed the Rule 10b-5 claim against Altman, noting that "the Amended Complaint makes no allegations that Altman was aware of Bloom's squandering of North Hills' assets." (App. at 41.) The Court explained that MB could not be liable under Section 10(b) of the Exchange Act and Rule 10b-5 because Bloom's fraudulent statements, and Altman's allegedly deceptive statements, related solely to investments in North Hills, "an entity unrelated to MB." (App. at 21.) The Court noted that "Plaintiffs do not charge that any individuals made false

---

[28] We speak here strictly of the duties associated with the common law tort of negligent supervision under Pennsylvania law, and do not imply anything regarding duties that may exist by virtue of other common law principles, statutes, rules, or regulations.

statements about MB or its investments." (*Id.*) Moreover, the Court said, "[w]ere this case about Bloom acting on behalf of MB, MB could not escape liability for Bloom's conduct," but "this case presents a different set of circumstances" because Bloom's fraud was perpetrated through an entity that had existed before he began working for MB and that had many investors who were not investors in MB. (*Id.*)

The Investors challenge the District Court's reasoning as to both Altman and MB, claiming that the Court "referenced no factual support for it premise that North Hills and MB were unrelated in the context of the Investors' [10b-5] claims." (Appellants' Opening Br. at 42.) The Investors also argue that the District Court erred when it dismissed their 10b-5 claim against Altman because they had "allege[d] facts sufficient to give rise to a strong inference that defendants were reckless." (*Id.* at 53.) Finally, the Investors say that statements by Bloom and Altman may be imputed to MB, "regardless of whether North Hills was affiliated with MB, because [their statements] were made in the course of their employment and with the apparent authority of MB." (*Id.* at 43.)

Rule 10b-5 makes it "unlawful ... [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[] in connection with the ... sale of any security." 17 C.FR. § 240.10b-5. The Rule implements Section 10(b) of the Exchange Act, which makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

To make out a securities fraud claim under Rule 10b-5, "a plaintiff must show that (1) the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2) the defendant acted with scienter; and (3) the plaintiff's reliance on the defendant's misstatement caused him or her injury." *Marion v. TDI, Inc.*, 591 F.3d 137, 152 (3d Cir. 2010) (internal quotation marks omitted). Scienter is "an intent to deceive, manipulate, or defraud." *Scattergood v. Perelman*, 945 F.2d 618, 622 (3d Cir. 1991) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194-214 (1976)). Rule 10b-5 thus requires "more than negligent nonfeasance ... as a precondition to the imposition of civil liability." *Id.*, 425 U.S. at 215. The pleading requirements for a Rule 10b-5 violation are heightened by the Private Securities Litigation Reform Act (PSLRA), Pub. L. No. 104-67, 109 Stat. 737 (1995), which requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

### i. The 10b-5 Claim Against Altman

The 10b-5 claim against Altman fails for the simple reason that the Investors have provided no evidence of scienter. To prove scienter, the Investors must show that Altman, with "a mental state embracing intent to deceive, manipulate, or defraud," *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst*, 425 U.S. at 193-94), made some material misrepresentation or omitted some material fact and so left a materially misleading impression on them. The Investors have adduced no such proof. They do not contend that, when Altman and Bloom met with Belmont and Wallace of PFS, or

41

that when Altman allegedly marketed North Hills as an MB investment option to the Kellys, Altman knew that North Hills was a fraud. The most they have said on this score is that Altman "touted" North Hills.

The Investors likewise fail to "specify the role" of Altman in Bloom's fraud or to "demonstrate[e] ... [his] involvement in misstatements or omissions," *see Winer Family Trust*, 503 F.3d at 335-36, as required under the PSLRA. Rather, the Investors attempt to satisfy the scienter requirement, and the PSLRA's heightened pleading standard, by arguing that Altman's praise of North Hills without sufficient investigation gives rise to a "strong inference that defendants were reckless." (Appellants' Opening Br. at 53.) However, for purposes of a Rule 10b-5 claim, "[a] reckless statement is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 267 n.42 (3d Cir. 2009) (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 535 (3d Cir. 1999)) (internal quotation marks omitted). Even if Altman did discuss North Hills as an investment option with Belmont, Wallace, or the Kellys, there is no evidence that the danger of misleading them was either known to Altman or so obvious that it should have been known, given Bloom's apparently successful investment track record. Therefore, Altman's statements about North Hills were neither knowingly false nor reckless, and the District Court properly dismissed the 10b-5 claim against him.

### ii. The 10b-5 Claim Against MB

In contrast to Altman, Bloom's violations of Rule 10b-5 are beyond dispute,[29] and the Investors argue that those violations may be imputed to MB as his employer. The Investors argue for imputation of Rule 10b-5 liability to MB because "Bloom jointly marketed MB and North Hills, led Investors to believe [North Hills] was a[n] MB product[,] and [Bloom] was not the only MB employee involved in marketing North Hills," the others being Machinist and Altman. (Appellant's Opening Br. at 42.)

Although the Investors' underlying securities fraud claims are governed by federal law, the issue of imputation is determined by state law. *See O'Melveny & Myers v. Fed. Deposit Ins. Corp.*, 512 U.S. 79, 84-85 (1994) (declining to "adopt[] a special federal common-law rule divesting States of authority over the entire law of imputation" and holding that "[state] law, not federal law, governs the imputation of knowledge to corporate victims of alleged negligence"). Under Pennsylvania law,

> [T]he fraud of an officer of a corporation is imputed to the corporation when the officer's fraudulent contact was (1) in the course of his employment, and (2) for the benefit of the corporation. This is true even if the officer's conduct was unauthorized, effected for his own benefit but clothed with apparent authority of

---

[29] Bloom pleaded guilty to all of the fraud-based counts in the Information filed against him. *See supra* Part I.A.5.

the corporation, or contrary to instructions. The underlying reason is that a corporation can speak and act only through its agents and so must be accountable for any acts committed by one of its agents within his actual or apparent scope of authority and while transacting corporate business.

*In re Pers. & Bus. Ins. Agency*, 334 F.3d 239, 242-43 (3d Cir. 2003) (internal quotation marks omitted).[30]

"[T]he imputation doctrine recognizes that principals generally are responsible for the acts of agents committed within the scope of their authority." *Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP* (*AHERF*), 989 A.2d 313, 333 (Pa. 2010). "This rule of liability is not based on any presumed authority in the agent to do the acts, but on the ground of public policy … that the principal who has placed

---

[30] Although we did not base that imputation standard, which we first articulated in *Rochez Brothers*, 527 F.2d at 884, specifically on Pennsylvania law, "the principles which [we] espoused are consistent with Pennsylvania agency law, succinctly stated by the Pennsylvania Supreme Court long ago." *Greenberg v. Grant Thornton L.L.P.* (*In re Greenberg*), 212 B.R. 76, 83-84 (Bankr. E.D. Pa. 1997) (citing *Nat'l Bank of Shamokin v. Waynesboro Knitting Co.*, 172 A. 131, 134 (Pa. 1934) ("The rule that knowledge or notice on the part of the agent is to be treated as notice to the principal is founded on the duty of the agent to communicate all material information to his principal and the presumption that he has done so.")).

the agent in the position of trust and confidence should suffer, rather than an innocent stranger." *Aiello v. Ed Saxe Real Estate, Inc.*, 499 A.2d 282, 285 (Pa. 1985). The imputation doctrine also advances public policy goals in that, "because it is the principal who has selected and delegated responsibility to [its] agents[,] ... the doctrine creates incentives for the principal to do so carefully and responsibly." *AHERF*, 989 A.2d at 333 (citing *Aiello*, 499 A.2d at 285-86); *accord* Restatement (Third) of Agency § 5.03 cmt. b (2006) ("Imputation creates incentives for a principal to choose agents carefully and to use care in delegating functions to them.").

Public policy concerns also implicate the "adverse interest" exception to the imputation doctrine. Under the "adverse interest" exception, "where an agent acts in his own interest, and to the corporation's detriment, imputation generally will not apply." *AHERF*, 989 A.2d at 333 (citing *Todd v. Skelly*, 120 A.2d 906, 909 (Pa. 1956)). The District Court applied the adverse interest exception only in the context of the UTPCPL, discussed *infra* Part II.C.2, and held that it barred imputation of Bloom's violations of that statute to MB. However, as the MB Defendants point out, arguments as to the potential application of the adverse interest exception "apply with equal force" to the Investors' 10b-5 claim (MB Defendants' Br. at 14), and so we turn to that exception at this point.

"The primary controversy surrounding the appropriate application of the adverse-interest exception ... concerns the degree of self-interest required, or, conversely, the quantum of benefit to the corporation necessary to avoid the exception's application (where self-interest is evident)."

45

*AHERF*, 989 A.2d at 334. At one end of the spectrum are cases holding that any benefit to the corporation will bar the application of the exception and trigger imputation. *Cf. Todd*, 120 A.2d at 909 ("Where an agent acts in his own interest which is antagonistic to that of his principal, ... the principal who has received no benefit therefrom will not be liable for the agent's tortious act."). At the other end of the spectrum are cases that hesitate to impute liability, even in the face of some benefit to the corporation. *Cf. Adelphia Commc'ns Corp. v. Bank of America* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 56 (Bankr. S.D.N.Y. 2007) (finding that the adverse interest exception might be applicable when there was only "a peppercorn of benefit to a corporation from the wrongful conduct"). Courts that favor "strong imputation rules, including a low threshold for benefit, support[] a potent form of *in pari delicto* defense," *AHERF*, 989 A.2d at 334, based on a concern "that weakening the defense and associated rules of imputation would represent an inappropriate reallocation of risks, as well as eviscerate socially useful defenses which otherwise would be available to those who transact with corporations," *id.* (citing *Am. Int'l Grp., Inc. Consol. Derivative Litig. v. Greenberg*, 976 A.2d 872, 889 (Del. Ch. 2009)). By contrast, courts that see "difficulty with applying too liberal a litmus for benefit," *AHERF*, 989 A.2d at 334, are concerned about potential "collusion between the agent and the defendant," *id.*, because imputation, and the resulting availability of the *in pari delicto* defense, "would provide total dispensation to defendants knowingly and substantially assisting insider misconduct," *id.* at 335 (quoting *In re Adelphia Commc'ns Corp.*, 365 B.R. at 56).

Whatever conclusions the District Court may have reached about the policy concerns affecting the adverse interest exception,[31] it erred in applying it. Under the exception, "the question generally should be whether there is a sufficient lack of benefit (or apparent adversity) [to the corporation] such that it is fair to charge the third party with notice that the agent is not acting with the principal's authority." *AHERF*, 989 A.2d at 338. The Court presumed that knowledge of Bloom's fraud is not imputable to MB because "[[w]]here one in transacting the business of his principal is committing fraud for his own benefit, he is not acting within the scope of his authority as his principal's agent ... ." (App. at 26 (quoting *Lilly v. Hamilton Bank of N.Y.*, 178 F. 53, 56 (3d Cir. 1909) (internal quotation marks omitted).) However, imputation to an employer is proper based on "acts committed by one of its agents within his actual or apparent scope of authority," *In re Pers. & Bus. Ins. Agency*, 334 F.3d at 243, and a swindler may still act with apparent authority, even if he is acting for his own benefit. Also, the District Court found sufficient "adversity of interest" in the fact that the discovery of the North Hills fraud ultimately destroyed MB as well. But that adverse impact occurred only after the exposure of the North Hills Ponzi scheme. While the scheme was on-going, at the time the Investors put their money in North Hills, what they knew did not necessarily give them notice that Bloom was acting

---

[31] It does not appear that this case implicates the concerns about the availability of the *in pari delicto* defense that one might argue to support the District Court's liberal application of the adverse interest exception. No defendant has tried to raise that defense – and with good reason, as there does not appear to be any basis at all for invoking it here.

47

outside the scope of his employment. Indeed, what they knew and what they should have concluded are contested issues of fact.

Ultimately, under Pennsylvania law,"[i]n light of the competing concerns, the appropriate approach to benefit and self-interest is best related back to the underlying purpose of imputation, which is fair risk-allocation, including the affordance of appropriate protection to those who transact business with corporations." *AHERF*, 989 A.2d at 335. We therefore conclude that imputation may be appropriate in this case, if the Investors can prove that the manner in which Bloom marketed North Hills to them while he was working for MB, and the apparent benefit to MB, made it appear that he marketed North Hills within the scope of his authority as a senior executive of MB.

There is a genuine issue of material fact as to whether Bloom's fraudulent statements were made as part of his employment with, and for the benefit of MB, so that those statements might be imputed to MB. On the one hand, the record indicates that Bloom made it clear that he, not MB or any of its other employees, personally managed North Hills, and North Hills' marketing and subscription materials, tax reporting documents, and capital account statements did not include any references to MB. On the other hand, there is evidence that Bloom marketed North Hills to existing and potential clients of MB in meetings that were ostensibly held to discuss MB's investment advisory services, and that he at times represented North Hills to be an MB fund. There is also evidence that Bloom openly used other MB employees to conduct North Hills business, used his MB business card in meetings in which he marketed North Hills, and presented an

asset allocation recommending an investment in North Hills on MB letterhead, all of which may have created the impression for at least some of the Investors that Bloom operated North Hills under the apparent authority of MB. Also, Bloom's operation of North Hills appears to have been of at least some benefit to MB. There is evidence that MB used access to North Hills as a selling point in the marketing of MB's investment advisory services, and MB used North Hills as a source of potential clients, soliciting North Hills' largest investors for business. If those points of evidence are accepted, there is a basis for imputation.

Imputation of Bloom's violations of Rule 10b-5 to MB would also be consistent with the public policy goals served by the imputation doctrine. The record suggests that MB placed Bloom "in [a] position of trust and confidence," *Aiello*, 499 A.2d at 285, that it permitted him to mix the operation of North Hills with his legitimate duties at MB, and that it should therefore share responsibility for the resulting losses. Likewise, MB "selected and delegated responsibility to" Bloom, *AHERF*, 909 A.2d at 333, but arguably did not do so "carefully and responsibly," *id.*, given that MB officers and directors knew that Bloom was operating North Hills but accepted compliance reports by Bloom that failed to adequately disclose details of the North Hills's operation.

Recognizing that "imputation rules justly operate to protect third parties on account of their reliance on an agent's actual or apparent authority," *id.* at 336, we cannot say that imputation of Bloom's violations of Rule 10b-5 to MB is inappropriate as a matter of law. The District Court thus erred when it granted summary judgment to MB on the Investors' 10b-5 claim.

*2.*    *Unfair Trade Practice and Consumer Protection Law Claims*

The District Court concluded that Altman could not be held liable under the UTPCPL because "the Amended Complaint does not sufficiently allege deceptive conduct on the part of Altman," and "[w]ithout any factual allegation that Altman was somehow involved with Bloom's fraud, ... [the Investors] cannot simply call Altman's actions deceptive and equate it with Bloom's stealing." (App. at 49.)

The District Court also granted summary judgment to MB on the UTPCPL claim. The Court recognized that statements by Bloom could potentially be imputed to MB, but it looked to the adverse interest exception to the doctrine of imputation to conclude that MB was not liable. The Investors argue that the District Court improperly applied the adverse interest exception because "[a]pplication of that exception is not determined from the perspective of the employer, as the District Court did, but rather on how the defrauded party perceives the speaker's authority." (Appellants' Opening Br. at 25.)

Pennsylvania's UTPCPL, 73 Pa. Cons. Stat. Ann. § 201-1 *et seq.*, "is designed to protect the public from fraud and deceptive business practices." *Gardner v. State Farm Fire & Cas. Co.*, 544 F.3d 553, 564 (3d Cir. 2008). The statute provides that

> [a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any

50

ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater.

73 Pa. Cons. Stat. Ann. § 201-9.2(a). "The UTPCPL regulates an array of practices which might be analogized to passing off, misappropriation, trademark infringement, disparagement, false advertising, fraud, breach of contract, and breach of warranty." *Ash v. Cont'l Ins. Co.*, 932 A.2d 877, 881 (Pa. 2007) (internal quotation marks omitted). The statute lists twenty specific prohibited practices, *see* 73 Pa. Cons. Stat. Ann. § 201-2(4)(i)-(xx), and also contains a "catch-all" provision, *see id.* § 201-2(4)(xxi), which the Investors cite as the basis for their UTPCPL claim. The catch-all provision provides a private right of action against a person "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." *Id.*

In the wake of an amendment to the UTPCPL in 1996 that expanded the catch-all provision to cover "deceptive" as well as fraudulent conduct, "Pennsylvania law regarding the standard of liability under the UTPCPL catchall is 'in flux.'" *Fazio v. Guardian Life Ins. Co.*, No. 1240 WDA, 2012 WL 6177271, at *8 (Pa. Super. Ct. Dec. 12, 2012); *see also id.* at *7-8 (comparing cases before and after the 1996 amendment of the UTPCPL).[32] Consequently, we are called upon to

---

[32] Division in our district courts parallels that in

51

predict what interpretation of the "deceptive conduct" standard the Pennsylvania Supreme Court would adopt. The Pennsylvania Superior Court's recent decision in *Fazio* was based on "decisions from the Commonwealth Court, the federal courts interpreting Pennsylvania law, as well as the statutory language of the post-amendment catchall provision." 2012 WL 6177271 at *9. The district court decisions on which *Fazio* relied suggest that deceptive conduct does not require proof of the elements of common law fraud, but that knowledge of the falsity of one's statements or the misleading quality of one's conduct is still required.[33] *See Wilson v.*

---

Pennsylvania's own courts. *See Molley v. Five Town Chrysler, Inc.*, No. 07-5415, 2009 WL 440292, at *3 (E.D. Pa. Feb. 18, 2009) ("Clearly there is uncertainty within the Circuit as to what type of conduct the 'catch all' provision of the UTPCPL protects."). Some district courts have held that "it is no longer necessary for a plaintiff to allege all of the elements of common law fraud in order to recover under the [UTP]CPL," *Flores v. Shapiro & Kreisman*, 246 F. Supp. 2d 427, 432 (E.D. Pa. 2002), and that a "plaintiff may allege deception, as opposed to common law fraud," *Davis v. Mony Life Ins. Co.*, No. 08-0938, 2008 WL 4170250, at *6 (W.D. Pa. Sept. 2, 2008). Other courts have continued to require plaintiffs proceeding under the catch-all provision of the UTPCPL to prove the elements of common law fraud, even when alleging mere deception. *See Rock v. Voshell*, 397 F. Supp. 2d 616, 622 (E.D. Pa. 2005) (noting that "all of the fraud elements are still required").

[33] It appears that a UTPCPL claim based on deceptive conduct differs from a claim based on fraudulent conduct in that a plaintiff "does not need to prove all of the elements of common-law fraud or meet the particularity requirement of

52

*Parisi*, 549 F. Supp. 2d 637, 666 (M.D. Pa. 2008) ("A deceptive act [under the UTPCPL] is the act of intentionally giving a false impression or a tort arising from a false representation made knowingly or recklessly with the intent that another person should detrimentally rely on it." (internal quotation marks omitted)). Therefore, a defendant cannot be held "derivatively liable" under the UTPCPL for the fraudulent actions of a third party when "plaintiff fails to allege or present any evidence that [the defendant] ever knowingly engaged in misrepresentation." *Canty v. Equicredit Corp. of Am.*, No. 01-5804, 2003 WL 21243268, at *3 (E.D. Pa. May 8, 2003).

### i. The UTPCPL Claim Against Altman

The deceptive conduct that the Investors allege against Altman was limited to three things: (1) his preparing (with Bloom) a proposed asset allocation plan for Belmont that recommended placing 20 percent of Belmont's MB-advised investments in North Hills, (2) his describing to Belmont and Wallace that MB had access to North Hills as an investment vehicle, and (3) his advising Belmont to transfer $1 million from his Schwab account into North Hills in February 2008. In dismissing the UTPCPL claim against Altman, the District

---

Federal Rule of Civil Procedure 9(b)." *Schnell v. Bank of New York Mellon*, 828 F. Supp. 2d 798, 807 (E.D. Pa. 2011). In *Fazio*, the Superior Court held that that a jury instruction that "deceptive conduct" for purposes of the UTPCPL is "'misleading' conduct accurately set[s] forth the standard of liability under the amended catchall provision." 2012 WL 6177271 at *9.

Court followed the more plaintiff-friendly standard of courts "that have allowed UTPCPL claims to move forward without demonstrating all of the elements of common law fraud" (App. at 48), but held that the three complained-of acts were not sufficient to establish deceptive conduct.

As a threshold issue, neither Perez nor the Kellys have stated a UTPCPL claim against Altman because they have not alleged any conduct on his part, deceptive or otherwise, that caused them to invest in North Hills. *Cf. Weinberg v. Sun Co.*, 777 A.2d 442, 446 (Pa. 2001) (noting that a UTPCPL plaintiff must demonstrate that he justifiably relied on the defendant's deceptive practice and that he suffered harm as a result of that reliance).

As to the claim of Belmont and PFS, there is no evidence that, in any of the conduct noted above, Altman acted either to defraud or deceive them. That claim fails even under the "deceptive conduct" standard that the District Court applied, because none of Altman's conduct comprised either "the act of intentionally giving a false impression" or "a false representation made knowingly or recklessly," *Wilson*, 549 F. Supp. 2d at 666, given that he is not alleged to have had any knowledge of the North Hills fraud at the time. Consequently, the District Court correctly dismissed the UTPCPL claims against Altman for a lack of factual allegations sufficient to satisfy the requirements of the catch-all provision of the UTPCPL.

> ii. *The UTPCPL Claim Against MB*

The District Court held that the adverse interest exception barred the imputation to MB of Bloom's admitted

54

frauds, which all acknowledge were violations of the UTPCPL.[34] Our earlier discussion of the proper application of the adverse interest exception, *supra*, is equally applicable to the Investors' UTPCPL claim against MB. As noted above, "[i]n light of the competing concerns, the appropriate approach to benefit and self-interest is best related back to the underlying purpose of imputation, which is fair risk-allocation, including the affordance of appropriate protection to those who transact business with corporations." *AHERF*, 989 A.2d at 335.

As a result, there remains a genuine issue of material fact as to whether Bloom's violations of the UTPCPL may be imputed to MB. There is some evidence that MB benefitted from Bloom's operation of North Hills, to the extent that access to North Hills was a selling point for MB, and MB was able to solicit North Hills investors for advisory business. There is, however, also evidence that the cross-marketing benefit to MB was limited, given that the two entities had only four clients in common, two of whom were Belmont and the Kellys. Also, MB never collected any fees or received any remuneration on account of any of the Investors' investments in North Hills.

Whether there was a sufficient lack of benefit to MB such that the Investors should have known that statements by

---

[34] Bloom's violations of the UTPCPL are presumably uncontested because he pled guilty to all of the fraud-based counts in the Information against him, which included various counts that involved deceptive practices with respect to the marketing of North Hills. *See supra* Part II.A.5.

55

Bloom in violation of the UTPCPL were made without MB's authority is a question for the trier of fact.

### C. *Claims For Breach Of Fiduciary Duty*

The Investors contend before us, as they did before the District Court, that Altman breached a fiduciary duty to them "by failing to investigate North Hills before recommending it as a suitable investment" (Appellants' Opening Br. at 60), and that MB also breached a fiduciary duty because "MB should have recognized Bloom's fraud," (*id.* at 50). The District Court rejected those contentions. It concluded that "[s]imply because Altman was an investment advisor at the same location where Bloom worked ... does not create a fiduciary relationship" (App. at 52), and therefore Altman could not be held liable for a breach of fiduciary duty owed to the Investors. The Court granted summary judgment to MB on the fiduciary duty claim because MB owed no such duty to those Investors who invested directly in North Hills, *i.e.*, PFS and Perez, and because those Investors to whom MB did owe fiduciary duties, *i.e.*, Belmont and the Kellys, had adduced no evidence that MB's alleged failure to act in their best interests was the cause of their North Hills losses.

The Pennsylvania Supreme Court has said that a plaintiff alleging a fiduciary breach must first demonstrate that a fiduciary or confidential relationship existed, *see Basile v. H & R Block, Inc.*, 761 A.2d 1115, 1119-22 (Pa. 2000), which requires that "one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms." *In re Estate of Clark*, 359 A.2d 777, 781 (Pa. 1976) (internal quotation marks

omitted).[35] "Although no precise formula has been devised to ascertain the existence of a confidential relationship, it has been said that such a relationship ... exists whenever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest." *Silver v. Silver*, 219 A.2d 659, 662 (Pa. 1966).

---

[35] We note that the fiduciary duty claims present a question of the proper choice of law. The claims are purportedly brought under state law, even though, as is more fully discussed herein, they are arguably an attempt to bring claims under federal law despite there being no private right of action available under federal of law. Assuming that the claims can be brought under state law, the question remains as to whether the law of Pennsylvania or of New York applies. The Investors are all citizens of the Commonwealth of Pennsylvania, and Altman and MB are citizens of the State of New York. *See supra* note 17. The parties have briefed only Pennsylvania law, and they explained at oral argument before us that they viewed the law of the state whose citizens claim the protection of the fiduciary relationship as controlling. The record is unclear as to whether the alleged fiduciary breaches by Altman and MB occurred in Pennsylvania or New York. However, following the approach of the Pennsylvania Supreme Court, "[s]ince the parties did not see fit to question the application of Pennsylvania law, we infer that th[at] state was in fact the situs of most of the allegedly wrongful conduct and accordingly decide the issues of fiduciary responsibility on the basis of [that state's] law." *Vulcanized Rubber & Plastics Co. v. Scheckler*, 162 A.2d 400, 403 n.2 (Pa. 1960).

The Investors claim a breach of fiduciary duty by MB under state law, but, at least insofar as Pennsylvania law is concerned, the evolution of duties governing investment advisers as fiduciaries appears to have been shaped exclusively by the Advisers Act and federal common law. The Advisers Act makes it unlawful for an investment adviser

> (1) to employ any device, scheme, or artifice to defraud any client or prospective client; (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client; (3) acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction. ... ; (4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative.

15 U.S.C. § 80b-6.[36]

---

[36] Broker-dealers are exempted from this provision of the Advisers Act, provided that they are not otherwise acting as investment advisers. 15 U.S.C. § 80b-6(3). At numerous places in their brief, the Investors attempt to equate MB, an investment adviser, with a "broker-dealer" or a "securities firm." (*See* Appellant's Opening Br. at 29 n.20 (noting that

In *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963), the Supreme Court interpreted the antifraud provision of the Advisers Act as expressing Congress's recognition that an investment adviser is a fiduciary with a duty of "utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to avoid misleading his clients." *Id.* at 194 (citations and internal quotation marks omitted); *see also id.* 191 (citing Congressional recognition of "the delicate fiduciary nature of an investment advisory relationship" (internal quotation marks omitted)); *id.* at 201(holding that an investment adviser who purchases a security for his own account and then

the "[r]ules of the SEC and self-regulatory organizations provide a standard of care for the securities industry," and collecting cases); *id.* at 38 (citing *Jairett v. First Montauk Sec. Corp.*, 153 F. Supp. 2d 562, 572-73 (E.D. Pa. 2001) ("[A] broker-dealer may be held liable for failing to strictly supervise the acts of a registered agent ... .")); *id* at 60 (citing *Hanley v. SEC*, 415 F.2d 589, 595-96 (2d Cir. 1969) ("Brokers and salesmen are under a duty to investigate, and … cannot deliberately ignore that which [they have] a duty to know and recklessly state facts about matters of which [they] are ignorant."))".) However, "investment adviser" is not synonymous with "broker-dealer," and the Pennsylvania Securities Act explicitly distinguishes broker-dealers from investment advisers. *See* 70 Pa. Cons. Stat. Ann. § 1-102(j)(iii) (excluding broker-dealers from the definition of "investment adviser"). Because "MB was never a registered broker-dealer, and [the Investors] have not even alleged otherwise" (Centre Defendant's Br. at 32 n.11), we decline the Investors' invitation to treat it as one.

recommends the same security to his client without disclosing that ownership violates the antifraud provision of the Act and breaches his fiduciary duty). The decision in *Capital Gains Research* has been interpreted as establishing a federal fiduciary standard for investment advisers. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 472 n.11 (1977) (interpreting the *Capital Gains Research* Court's "references to fraud in the 'equitable' sense" as "recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"); *Transam. Morg. Advisors (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979) (finding that "the [Advisers] Act's legislative history leaves no doubt that Congress intended to impose enforceable fiduciary obligations").

Because of the federal fiduciary standard, some courts dealing with private causes of action alleging fiduciary breach by investment advisers have relied on federal, rather than state, common law. *See Laird v. Integrated Res., Inc.*, 897 F.2d 816, 837 (5th Cir. 1990) ("The Supreme Court has recognized the investment advisers' fiduciary status. Courts may refer to [its] cases instead of state analogies in deciding whether this status prohibits particular conduct."); *see also id.* ("[C]oncerning entanglement with state law, because our holding encompasses a developed federal standard, it does not require reference to state corporate and securities law or the state law of fiduciary relationships."); *State ex rel. Udall v. Colonial Penn Ins. Co.*, 812 P.2d 777, 785 (N.M. 1991) (citing *Capital Gains Research*, and applying the standard set forth therein, in ruling on a state law claim for breach of fiduciary duty against an investment adviser); *cf. Douglass v. Beakley*, ___ F. Supp.2d ___, 2012 WL 5250566, *11 & n.16 (N.D.Tex., Oct. 24, 2012) (citing Texas law for breach of

60

fiduciary duty claims, but noting that the Supreme Court in *Transamerica* recognized "that Section 206 of the IAA "establishes federal fiduciary standards to govern the conduct of investment advisers" (citing *Transamerica*, 444 U.S. at 17)); *but cf. In the Matter of O'Brien Partners, Inc.,* S.E.C. Release No. 7594, 88 S.E.C. Docket 615, 1998 WL 744085, *9 n.20 (Oct. 27, 1998) (noting that respondent "owed a fiduciary duty to its clients, both as a financial advisor and as an investment adviser[,]" and adding by footnote that "[i]n addition to its duties under the Advisers Act, relevant state law also imposed a fiduciary duty on [respondent]," with citations to Wisconsin and California law). Among other benefits, following the federal fiduciary standard has as the particular virtue that, "because state law is not considered, uniformity is promoted." *Laird*, 897 F.2d at 837.

Of course, if one looks to federal law for the statement of the duty and the standard to which investment advisers are to be held, one might reasonably wonder why the cause of action is presented as springing from state law, and the answer is straightforward: no federal cause of action is permitted. With the exception of a private remedy relating to certain investment advisory contracts,[37] "the [Advisers] Act confers no other private causes of action, legal or equitable."

---

[37] There exists only "a limited private remedy under the [Advisers Act] to void an investment advisers contract" made in violation of the Act. *Transam. Morg. Advisors (TAMA) v. Lewis*, 444 U.S. 11, 24 (1979); *see also* 15 U.S.C. § 80b-15 (providing that any contract whose terms would violate the Advisers Act shall be void both as to parties to the contract and as to third parties who acquire rights under the contract).

*Transam. Morg. Advisors*, 444 U.S. at 24. That reality ought to call into serious question whether a limitation in federal law can be circumvented simply by hanging the label "state law" on an otherwise forbidden federal claim.[38] Questionable or not, however, that is the labeling game that has been played in this corner of the securities field, and the confusion it engenders may explain why there has been little development in either state or federal law on the applicable standards. Half a century later, courts still look primarily to *Capital Gains Research* for a description of an investment adviser's fiduciary duties. *See SEC v. DiBella*, 587 F.3d 553, 567 (2d Cir. 2009) (citing *Capital Gains Research* for the proposition that an investment adviser is a fiduciary).

We need not resolve whether the Investors' fiduciary duty claims can properly be brought as a matter of state law because, even if Pennsylvania and federal law permit a private right of action for a breach of an investment adviser's fiduciary duties, and assuming that the proper standard of care is the federal standard,[39] the Investors have not

[38] And, in fact, the viability of a state law claim for a fiduciary breach by an investment adviser has been questioned. *See Steadman v. SEC*, 603 F.2d 1126, 1142 (5th Cir. 1979) ("We do not think this overall purpose [of the Advisers Act] is a warrant to read ... the [antifraud] sections ... as the vehicle to reach all breaches of fiduciary trust.").

[39] Given the paucity of Pennsylvania law on the fiduciary duties owed by investment advisers, and given that Pennsylvania statutory law expressly follows the Advisers Act, we believe that, if Pennsylvania were to sanction such a claim, it would follow the federal standard. Provisions of the Pennsylvania Securities Act ("PSA"), 70 Pa. Cons. Stat. Ann.

§§ 1-101 *et seq.*, applicable to investment advisers prohibit fraudulent, deceptive, or manipulative practices. *See* 70 Pa. Cons. Stat. Ann. § 1-404 (describing "prohibited advisory activities"). The PSA does not impose any affirmative duty to investigate investments, but merely says that an investment adviser may not "make any untrue statement of material fact or omit to state a material fact necessary in order to make the statements made ... not misleading" as part of the "solicitation of advisory clients." *Id.* § 1-404(b). Pennsylvania regulations governing registered investment advisers require that they "exercise diligent supervision over the securities activities ... of [their] agents, investment adviser representatives, and employees" and require investment advisers to adopt internal compliance procedures similar to those mandated by the Advisers' Act. *See* 10 Pa. Code § 305.011(a). However, the PSA also provides that the requirements it imposes on investment advisers do not establish a standard of care that can be the basis of civil liability. *See* 70 Pa. Cons. Stat. Ann. § 1-506 ("Except as explicitly provided in this act, no civil liability in favor of any private party shall arise against any person by implication from or as a result of the violation of any provision of this act or any rule hereunder."); *see also Cover v. Cushing Capital Corp.*, 497 A.2d 249, 253 (Pa. Super. Ct. 1985) ("Regulations adopted pursuant to the [Pennsylvania] Securities Act were intended to make broker-dealers responsible to the state, rather than to any specific person or group. They were not intended to provide an absolute standard of care to be applied in a civil action against a broker where an agent, unbeknownst to the broker, engaged in a private scheme to defraud his friends and customers."). Although "broker-dealer" is generally not synonymous with "investment

63

succeeded in stating such a claim, let alone adducing proof sufficient to withstand summary judgment for the reasons set forth below. The federal fiduciary standard requires that an investment adviser act in the "best interest" of its advisory client. *See, e.g., SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008) ("[15 U.S.C. § 80b-6] imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund and its investors."). Under the "best interest" test, an adviser may benefit from a transaction recommended to a client if, and only if, that benefit and all related details of the transaction are fully disclosed. *See Capital Gains Research*, 375 U.S. at 191-92. (stating that the Advisers Act was meant to "eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser – consciously or unconsciously – to render advise which was not disinterested"). In addition to the clear statutory prohibition on fraud, the federal fiduciary standard thus focuses on the avoidance or disclosure of conflicts of interest between the investment adviser and the advisory client. *See* 17 C.F.R. § 275.204A-1 (describing the required investment adviser code of ethics, and its focus on conflicts of interest); *cf. Capital Gains Research*, 375 U.S. at 191-92 (discussing the obligations of investment advisers).[40]

---

adviser," the regulations cited apply both to "[e]very broker-dealer and investment adviser registered under the [PSA] ... ." 10 Pa. Code. § 305.011(a). Ultimately, however, even if Pennsylvania were to apply its own fiduciary duty standards, the Investors' claims would fail. *See infra* n.44.

[40] It has been suggested that the fiduciary duty of investment advisers under the federal standard goes beyond the avoidance of fraud and conflicts of interest. At least one court has held that an investment adviser has "a duty to his

64

Because Altman and MB had different relationships with various Investors – some advisory and some not – we

clients and readers to undertake some reasonable investigation of the figures he [is] printing before he print[s] them." *SEC v. Blavin*, 557 F. Supp. 1304, 1314 (E.D. Mich. 1983), *aff'd,* 760 F.2d 706 (6th Cir. 1985). The SEC has also proposed regulations that would expressly prohibit investment advisers from making "unsuitable recommendations to clients." *See* Suitability of Investment Advice Provided by Investment Advisers; Custodial Account Statements for Certain Advisory Clients, Advisers Act Release No. 1406, 59 Fed. Reg. 13,454, 13464 (Mar. 16, 1994) (describing a proposed "suitability rule" to be promulgated at 17 C.F.R. 275.206(4)-5). In addition, the SEC proposed a number of regulations aimed at hedge funds that would have, *inter alia*, imposed a duty "to have a reasonable basis for client recommendations"). *See* Registration Under the Advisers Act of Certain Hedge Fund Advisers, Advisers Act Release No 2333, 69 Fed. Reg. 72,054, 72054 (Dec. 2, 2004). Notably, that Release was later vacated by the United States Court of Appeals for the District of Columbia Circuit. *Goldstein v. SEC*, 451 F.3d 873, 882-83 (D.C. Cir. 2006). Moreover, we find nothing in *Capital Gains Research* or the Supreme Court cases that came after it that extended the Court's interpretation of the Advisers Act to encompass a fiduciary duty of "reasonable investigation." We also find nothing in the record to suggest that North Hills, had it been the successful hedge fund that Altman and MB believed it to be, was "unsuitable" for any of the Investors.

discuss the Investors' direct fiduciary duty claims against each of them separately.[41]

### 1. *Fiduciary Duty Claim Against Altman*

The Investors appeal the District Court's dismissal of their breach of fiduciary duty claim against Altman only with respect to Belmont and PFS, and do not appeal the dismissal as it may pertain to Perez and the Kellys.[42] The Court rejected the claim concerning Belmont and PFS because it concluded that neither of those plaintiffs had established that Altman was in a fiduciary relationship with them, and that there was no evidence of conduct on the part of Altman that would constitute a breach, even if such a relationship had existed.

---

[41] Because Bloom breached the federal fiduciary standard when he deceived the Investors as to the true nature of North Hills, in violation of 15 U.S.C. § 80b-6, our discussion of the imputation doctrine, *supra*, may arguably be applicable to the Investors' claim that MB breached its fiduciary breach to them. Unlike their 10b-5 and UTPCPL claims, however, the Investors' fiduciary duty claim against MB is not one that they argue involves principles of imputation. Consequently we do not address that question.

[42] The District Court concluded that the Investors had made "no allegation of any relationship between Altman and Plaintiff Perez or the Kellys, let alone a fiduciary one" (App. at 51), a conclusion that the Investors do not challenge in this appeal.

The Investors argue that Altman had a fiduciary relationship with Belmont because Belmont was an advisory client of MB's, and that Altman was a fiduciary to PFS because he took on an advisory role when he met with Wallace, the sole principal of PFS, to discuss North Hills. The Investors say that Altman breached his fiduciary duty because he "tout[ed] North Hills and its claimed performance to Belmont and [PFS]" and "recommend[ed]/directed[ed] Belmont's transfer of $1 million to North Hills from [Belmont's] MB-managed Schwab account." (Appellants' Opening Br. at 58.) Those arguments fall short. First, PFS was not an MB advisory client, and Altman therefore owed him no duty as an investment adviser. Altman met with Wallace only once, in June 2006, and PFS did not invest in North Hills until September 2008, suggesting that, to the extent PFS relied at all on statements allegedly made by Altman, that reliance was extremely limited. It is impossible to infer from the minimal contact that Wallace and Altman had that an investment advisory relationship was formed with PFS, and the District Court thus properly dismissed the PFS fiduciary duty claim against Altman.

Unlike PFS, Belmont did have an investment advisory agreement with MB, and Altman served as Belmont's portfolio manager. Also unlike PFS, Belmont invested in North Hills shortly after the June 2006 meeting with Altman and Bloom, at which they allegedly recommended such an investment. For the sake of argument, then, we will accept the assertion that Altman had a fiduciary relationship with Belmont. Even accepting that premise, however, there is no evidence of fraud on the part of Altman and no allegation that he benefitted from his recommendation that Belmont invest in North Hills in a manner that would constitute an undisclosed

67

conflict of interest. The mere fact that Altman made what turned out to be an ill-advised recommendation to Belmont is not sufficient to establish a breach of fiduciary duty under the federal fiduciary standard. The District Court thus did not err in dismissing Belmont's fiduciary duty claim against Altman.

> 2. *Fiduciary Duty Claim Against MB by PFS and Perez*

The District Court granted summary judgment on the fiduciary duty claim of PFS and Perez against MB because there was no evidence of a fiduciary relationship. However, Wallace and Perez argue that they "believed that North Hills was an investment vehicle provided by MB and, as such, [that] MB was their investment adviser with respect to their North Hills investments." (Appellants' Opening Br. at 47).

Although there may at one time have been some confusion on the part of Perez and PFS as to the relationship between North Hills and MB, there is no evidence that there was an advisory relationship between MB and either Perez or PFS pursuant to which they could claim the protection of the federal fiduciary standard. Perez and PFS invested no money with MB and signed no investment advisory agreement with MB. Both Perez and PFS's principal, Wallace, knew that they were investing in North Hills, rather than MB, and that Bloom was the sole portfolio manager of North Hills. Perez had met Bloom in connection with a matter unrelated to MB, telephoned Bloom directly for investment advice, and invested in North Hills based on Bloom's personal recommendation. For his part, Wallace testified that he gave the funds that he invested in North Hills directly to Bloom and that he never discussed with Bloom the possibility of

68

investing that money in MB or any of its managed funds. Wallace further admitted that in his only conversation with Machinist, they discussed only funds offered by MB and not North Hills or anything about Bloom's separate fund.

In the absence of any investment by Perez or PFS through MB, or any other reason why Perez and PFS should have thought that MB was their investment adviser with respect to their North Hills investments, the District Court properly held that there was no fiduciary relationship that would support a claim by Perez and PFS for a breach of fiduciary duty by MB, and the Court therefore correctly granted summary judgment to MB on that claim.

### 3. Fiduciary Duty Claim Against MB by Belmont and the Kellys

The District Court acknowledged, and MB does not contest, that MB owed a fiduciary duty to Belmont and the Kellys based on their investment advisory agreements with MB. The Investors argue that the District Court ignored evidence that MB had breached its fiduciary duty to Belmont and the Kellys by failing to uncover and disclose the North Hills fraud.

Applying the federal fiduciary standard to this case, Belmont and the Kellys have failed to prove that MB breached its fiduciary duty as their investment adviser. They have not alleged any conflict of interest, in the context of MB's limited involvement in their North Hills investments. And, to the extent they refer to Bloom's fraud, it is merely to repeat the allegation made in the context of their other claims that "there was more than enough evidence – in MB's

possession – from which MB should have recognized Bloom's fraud." (Appellants' Opening Br. at 50.) But, while MB's failure to uncover the North Hills fraud may have been a "real factor" in the losses sustained by Belmont and the Kellys, it is not sufficient to establish that MB failed to act solely in their interest.[43] The District Court thus did not err in granting summary judgment to MB on the claim for breach of fiduciary duty to Belmont and the Kellys.[44]

---

[43] The fact that MB continued to manage investments for the Kellys until it ceased operations in June 2009 also suggests that they, at least, did not think that MB had acted in bad faith or under a conflict of interest in connection with their North Hills investments.

[44] Even if Pennsylvania did not follow the federal fiduciary standard for investment advisers, *see supra* note 39, we do not think that it would affect the disposition of the Investors' direct fiduciary claims. The Pennsylvania Supreme Court has said that a plaintiff alleging a fiduciary breach must first demonstrate that a fiduciary or confidential relationship existed, *see Basile v. H & R Block, Inc.*, 761 A.2d 1115, 1119-22 (Pa. 2000), which requires that "one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms." *In re Estate of Clark*, 359 A.2d 777, 781 (Pa. 1976) (internal quotation marks omitted); *see also eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 23 (Pa. Super. Ct. 2002) ("[T]he critical question is whether the relationship goes *beyond* mere reliance on superior skill, and into a relationship characterized by overmastering influence on one side or weakness, dependence or trust, justifiably reposed on the other side." (internal quotation marks omitted)).

## III. CONCLUSION

For the foregoing reasons, we will affirm in part and vacate in part the District Court's dismissal order and

---

None of the Investors has demonstrated a relationships characterized by such justifiable reliance or "overmastering influence." PFS and Perez were not clients of either Altman or MB, and therefore could not justifiably rely on any advice they received regarding North Hills. Altman met with Wallace of PFS only once, in June 2006, and PFS did not invest in North Hills until September 2008, suggesting that any reliance on either Altman or MB was extremely limited. Perez can point to nothing more than single phone conversation with Bloom while he was in his office at MB. Because they had advisory agreements with MB, Belmont and the Kellys have better grounds on which to claim a fiduciary relationship. However, Pennsylvania law is clear that a fiduciary relationship does not exist merely because one party receives, or even relies on advice from another, but rather requires that "the parties do not deal with each other on equal terms*." Estate of Clarke*, 359 A.2d at 781. Nothing in Belmont's or the Kellys' relationships with Altman and MB suggests that they dealt on unequal terms. On the contrary, both Belmont and the Kellys were at all times free to reject any recommendation that Altman or MB may have made concerning a possible investment in North Hills. Again, the mere fact that one takes another's advice does not, in itself, demonstrate the "overmastering influence" that the law requires.

summary judgment. We will affirm to the extent that the Court dismissed all of the Investors' claims against Altman, granted summary judgment to all of the other defendants, other than MB, on all of the Investors' claims, and granted summary judgment to MB on the claim for breach of fiduciary duty. We will vacate the grant of summary judgment to MB on the claims for violations of Rule 10b-5 and the UTPCPL, and we will remand this case for a trial with respect to those claims against MB.